**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | | |
|---|---|---|
| ANA HINES, AS TRUSTEE OF | § | |
| ESTATE OF MARIA LUZ PERALTA, | § | |
| AND INDIVIDUALLY, AS | § | |
| BENEFICIARY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **EP-11-CV-545-KC** |
| | § | |
| LIBERTY LIFE | § | |
| INSURANCE COMPANY AND | § | |
| CITIMORTGAGE INC., | § | |
| | § | |
| Defendants. | § | |

## ORDER

On this day, the Court considered Plaintiff's Motion for Partial Summary Judgment ("Pl.'s Mot."), ECF No. 21, Defendant CitiMortgage's Cross-Motion for Summary Judgment ("Def. CitiMortgage's Mot."), ECF No. 23, and Defendant Liberty Life's Cross-Motion for Summary Judgment ("Def. Liberty Life's Mot."), ECF No. 26.  As set forth below, the parties' motions and supporting evidence demonstrate that genuine controversies remain as to certain facts that are critical to the disposition of this case.  This case cannot, therefore, be resolved by summary judgment for any party.  Each one of the parties' motions is hereby **DENIED**.

## I.     BACKGROUND[1]

This case involves a specialized insurance contract designed to pay off the outstanding balance of a home mortgage upon the accidental death of an insured person.  The mortgaged

---

[1] Because many of the exhibits in the record lack page numbers of their own or are not numbered consecutively, this Order refers to the page numbers supplied at the top of each page by the electronic docketing system.  For the purposes of this Order, this convention is applied to all submissions of the parties, including the parties' motions and briefs.

home pertaining to this case is located at 5853 Diamond Point Circle, El Paso, Texas, 79912. *See, e.g.*, Def. CitiMortgage's Mot. Ex. B ("Single Application") 2, ECF No. 23-3; Def. CitiMortgage's Mot. Ex. D ("Joint Application") 2, ECF No. 23-5. As explained below in greater detail, the parties essentially dispute whether any insurance contract was ever validly concluded to insure the life of Plaintiff's mother, Maria Luz Peralta ("the Deceased"), who was the mortgagor and resident of 5853 Diamond Point until her death in 2007.

The central question in this case is whether a "meeting of the minds" occurred with respect to insuring the life of the Deceased. Most of the facts are undisputed. Important controversies remain, however, as to whether two items of correspondence were actually mailed and received in or around August 2005, and whether a third item of correspondence dated August 26, 2005, evidenced Defendants' intention to insure the life of the Deceased.

A.      **Defendants' Insurance Product**

It is undisputed that Defendants collaborated in 2005 to market an insurance product known as "Mortgage Decreasing Accidental Death Insurance." *See* Def. CitiMortgage's Mot. Ex. A-3 ("Defs.' Template Application") 25, ECF No. 23-2. Under these specialized insurance contracts, Defendant Liberty Life would undertake to pay Defendant CitiMortgage the balance of a certain mortgage upon the accidental death of an insured person. *See id.* On the otherwise blank applications for these insurance contracts, Defendant CitiMortgage was automatically designated as the beneficiary. *See* Single Appl. 2; Joint Appl. 2.

Defendants' insurance product was marketed in standardized solicitation letters, a template for which has been provided by Defendants. Defs.' Template Appl. 25. Each solicitation letter was attached to a blank application for Defendants' insurance product that could be filled out by a single applicant or by two applicants jointly. *See id.* The blank

applications were brief, requiring only that the applicants supply their name, date of birth, telephone number, social security number, and gender.  *Id.*  No other information or additional documentation was requested.  *Id.*  The blank applications also required applicants to check a box indicating whether they chose to apply individually (and therefore pay a single applicant's "SRATE" premiums) or jointly (and therefore pay joint applicants' "JRATE" premiums).  *See id.*  As the template for Defendants' solicitation letter explains, both the SRATE and the JRATE premiums "are based on [the mortgagors'] outstanding mortgage balance at the time of application."  *Id.* at 26.

From the standardized solicitation letters, it appears that Mortgage Decreasing Accidental Death Insurance was typically marketed to individuals who met two requirements.  In the motions for summary judgment now before the Court, the parties have made extensive arguments about the importance of these two requirements.

First, these insurance policies were typically marketed to mortgagors who had previously received home loans from Defendant CitiMortgage.  *Id.*  That is, the standardized solicitation letter prominently displayed these words at the top of the page: "For customers of CitiMortgage."  *Id.*  The body of the solicitation letter also explained that this insurance product "is designed to pay off *your outstanding principal mortgage balance* . . . in the event of a covered accidental death . . . ."  *Id.*  (emphasis added).  "[F]or just pennies a day . . . conveniently collected along with *your monthly mortgage payment*," the solicitation letter explained that "*[y]ou and your spouse or co-borrower can be covered.*"  *Id.* (emphasis added).  "[Y]ou can take steps to help protect your family and your home."  *Id.*

Second, these insurance policies were typically marketed to individuals within a specified age range.  *Id.*  That is, the front of the solicitation letter explained in bold print that "your

acceptance is guaranteed *(if from the age of 18 through 69).*"  Defs.' Template Appl. 25 (emphasis added).  The back of the solicitation letter repeated that, "*[i]f you're from the age of 18 through 69*, you can't be turned down for this valuable insurance . . . ."  *Id.* at 26 (emphasis added).

The solicitation letter, therefore, reveals that Defendants' insurance product was typically marketed to (1) existing customers of Defendant CitiMortgage who were (2) between the ages of eighteen and sixty-nine.  The Court does not, however, find any unequivocal disclaimers in the solicitation letter indicating that Defendant Liberty Life would automatically refuse to insure an individual who did not meet both criteria.  For example, the statement in the solicitation letter that "you and *your spouse* or co-borrower can be covered," suggests that at least the borrowers' spouses might be eligible even if they were not also customers of Defendant CitiMortgage.  *See id.* (emphasis added).  Nothing in the solicitation letter directly addresses the eligibility of other family members or even non-family members.  Similarly, the two references to the age restriction are likewise not categorical rejections of any group of persons.  These two statements indicate respectively that an applicant's "acceptance is guaranteed" and that the applicant "can't be turned down" if the applicant is between the ages of eighteen and sixty-nine.  Neither statement expresses definitively that an application would be automatically rejected if an applicant's age did not fall within this range.

### B.    Plaintiff and Her Mother, the Deceased

It is undisputed that both Plaintiff and her mother, the Deceased, submitted applications to Defendants in 2005 for Mortgage Decreasing Accidental Death Insurance.  Single Appl. 2; Joint Appl. 2.  Neither Plaintiff nor the Deceased, however, were both (1) existing customers of Defendant CitiMortgage and also (2) between the ages of eighteen and sixty-nine at the time of

4

their applications.  Neither Plaintiff nor the Deceased, therefore, fell squarely within the category of individuals to whom the Defendants apparently marketed their insurance product.  *See* Defs.' Template Appl. 26.

Plaintiff satisfied the second condition, but not the first.  Born in 1953, Plaintiff was fifty-two years old at the time she applied to Defendants for insurance.  *See* Joint Appl. 2.  She therefore fell within the age range set out in the standardized solicitation letter.  But Plaintiff was not, apparently, a customer of Defendant CitiMortgage.  Plaintiff testifies by affidavit that she has "never been the mortgagor or owner of the home located at 5853 Diamond Point Circle, El Paso, Texas," for which Defendant CitiMortgage was a mortgagee and to which Defendants sent solicitation letters in 2005.  Pl.'s Resp. ("Hines Affidavit") 1, ECF No. 28-4; *see also* Def. CitiMortgage's Mot. Ex. A ("Flynn Affidavit") 2-3, ECF No. 23-2; *see also* Single Appl. 2; Joint Appl. 2.  The affidavit submitted by Defendant CitiMortgage's senior vice president, Leeann Flynn, confirms Plaintiff's testimony that Plaintiff was "not listed as a mortgagor/borrower" on the loan documents associated with this mortgaged home.  Flynn Aff. 3.  Accordingly, the explanatory statements in the solicitation letters that the insurance product was "[f]or *customers of CitiMortgage*" and that "[t]his valuable coverage is designed to pay off *your outstanding principal mortgage balance*" apparently could not have been directed at Plaintiff.  *See* Defs.' Template Appl. 25 (emphasis added).

By contrast, the Deceased satisfied the first condition, but not the second.  Unlike Plaintiff, the Deceased was a customer of Defendant CitiMortgage in 2005, as the owner and mortgagor of the home located at 5853 Diamond Point.  *See* Flynn Aff. 2.  Because she was born in 1918, however, the Deceased was eighty-six years old at the time when she received the first solicitation letter in April 2005.  *See* Joint Appl. 2 (indicating that the Deceased's date of birth

5

was May 26, 1918).  She would celebrate her eighty-seventh birthday at the end of the following month.  *See id.*

Therefore, at the time when their applications for Mortgage Decreasing Accidental Death Insurance were submitted in 2005, neither Plaintiff nor the Deceased was both (1) an existing customer of Defendant CitiMortgage and (2) between the ages of eighteen and sixty-nine.  These facts are undisputed by any party in this case.

C.    **The Deceased's First Application**

It is also undisputed that the Deceased submitted the first of two applications for insurance to Defendant Liberty Life on April 23, 2005.  Single Appl. 2.  This first application was incomplete.  *Id.*  In this application, the Deceased did not provide most of the information requested, such as her date of birth or social security number.  *Id.*  Rather, the Deceased merely signed and dated the application, and then drew an arrow to indicate that she was the resident of 5853 Diamond Point, which was the mortgaged home where Defendants' solicitation letter and blank application had been sent.  *See id.*

The Deceased had also marked a box next to the following option: "Sign me up for Mortgage Decreasing Accidental Death Insurance at $17.40 per month."  *Id.*  A comparison with Defendants' template application shows that this $17.40 was the "SRATE" amount, or the rate for a single applicant to pay in premiums for insurance specifically associated with the mortgaged home.  *See* Defs.' Template Appl. 25.  The Deceased left blank the box indicating an applicant's request for Defendants to "[s]ign both of us up for Mortgage Decreasing Accidental Death Insurance at $26.10 per month."  Single Appl. 2.  This higher amount, according to the Defendants' template application, constituted the "JRATE" or the joint rate for two applicants

applying together for an insurance policy associated with the same mortgaged home.  Defs.'
Template Appl. 25.

When Defendant submitted her incomplete application on April 23, 2005, she had already
been "pre-approved for $174,002" of her outstanding mortgage balance at that time.  Single
Appl. 2.  The amount specified for the Deceased's SRATE premium of $17.40 was apparently
derived from her "outstanding mortgage balance at the time of application."  *See* Defs.' Template
Appl. 26.

After the Deceased submitted her incomplete application on April 23, 2005, Defendant
Liberty Life responded on May 2, 2005, with a request for more information.  Def.
CitiMortgage's Mot., Ex. C ("Request for Clarification") 2, ECF No. 23-4.  In the request, one of
Defendant Liberty Life's analysts asked the Deceased to "return the completed form within 14
days to prevent [her] file from being closed as 'incomplete.'"  *Id.*  The Court has seen no
evidence that the Deceased took any action with respect to Defendant Liberty Life's request for
more information within the subsequent fourteen days.

### D.     The Joint Application by Plaintiff and the Deceased

It is undisputed that several months later, on July 20, 2005, the Deceased submitted a
second application for Mortgage Decreasing Accidental Death Insurance.  Joint Appl. 2.
Plaintiff, the daughter of the Deceased, appears to have assisted her mother with the application
this time.  *Id.*  That is, this second application was completely filled out, and Plaintiff herself was
identified as the "Applicant."  *Id.*  The name of the Deceased was written in the blank marked for
the "Second Applicant."  *Id.*

By July 20, 2005, apparently, both the SRATE for a single applicant and the JRATE for
joint applicants had been reduced, most likely because an additional portion of the Deceased's

mortgage balance had been paid off in the months since April 23, 2005. *See id.* This time, Plaintiff was pre-approved for only $171,144 of Mortgage Decreasing Accidental Death Insurance. *Id.* Accordingly, the SRATE was only $17.11, while the JRATE was only $25.67. To indicate that both Plaintiff and the Deceased were applying jointly, they checked the box requesting that Defendant Liberty Life "[s]ign both of us up for Mortgage Decreasing Accidental Death Insurance at $25.67 per month" at the JRATE. *Id.* The box next to the SRATE was left blank. *Id.* This time, the application indicated that the Deceased's date of birth was May 26, 1918. *Id.*

### E.     Correspondence in August 2005

The parties disagree about how Defendants responded to the joint application. In particular, the record reveals factual controversies relating to three items of correspondence between the parties in or around August 2005.

### 1.     The collection letter dated August 26, 2005

Plaintiff alleges that the next communication received by the Deceased from either Defendant was a letter from Defendant CitiMortgage dated August 26, 2005. Pl.'s Mot. Ex. B ("First Collection Letter") 2, ECF No. 21-2. This letter is addressed to the Deceased at 5853 Diamond Point. *Id.* In this First Collection Letter, Defendant CitiMortgage announces that they had "been informed by Liberty Life to begin collecting the premium for your Accidental Death plan. Effective 10/01/05, the monthly premium of $17.11 will be collected with your monthly CitiMortgage payment . . . . If you have any questions concerning your Accidental Death plan, please contact Liberty Life directly . . . ." *Id.* This First Collection Letter made no reference to Plaintiff, the daughter of the Deceased. *Id.* After identifying the Deceased by name as the addressee at the top of the page, the letter used only second-person pronouns, "you" and "your."

8

*Id.*  This First Collection Letter also made no reference to either the single application submitted by the Deceased on April 23, 2005, or the joint application submitted by Plaintiff and the Deceased on July 20, 2005.

In Plaintiff's view, Defendant CitiMortgage's use of the words, "your Accidental Death plan," referred to an insurance policy in which Defendant Liberty Life had undertaken to insure the life of the Deceased.  Pl.'s Mot. 1.  In Defendants' view, this First Collection Letter referred to a policy to insure only the life of Plaintiff herself.  *E.g.*, Def. CitiMortgage's Mot. 10, ECF No. 23.

## 2.    The rejection letter dated August 8, 2005

Defendants allege that Defendant CitiMortgage's First Collection Letter was preceded by a letter from Defendant Liberty Life to the Deceased on August 8, 2005.  Def. CitiMortgage's Mot. Ex. E ("Rejection Letter") 2, ECF No. 23-6.  This Rejection Letter explains that "[u]nfortunately this plan of insurance is only available for ages 18-69" and that therefore Defendant Liberty Life was "unable to consider [the Deceased's] application."  *Id.*  Like the First Collection Letter, this letter is also addressed to the Deceased at 5853 Diamond Point, and makes no mention of Plaintiff.  *Id.*  In Defendants' view, the Rejection Letter demonstrates that there was never any policy insuring the life of the Deceased.  *See* Def. CitiMortgage's Mot. 6.

Plaintiff, for her part, disputes that this Rejection Letter was ever sent by Defendant Liberty Life or received by the Deceased.  Pl.'s Resp. ("Pl.'s Proposed Undisputed Facts") 2, ECF No. 37-7.[2]  Plaintiff observes that Defendants have provided no testimonial or documentary

---

[2] In her original complaint, Plaintiff suggested that this Rejection Letter of August 8, 2005, was a forgery.  That is, Plaintiff indicated that the Rejection Letter bore "indicia of . . . being fabricated to deny coverage under the policy."  Pl.'s Original Compl. 10.  Plaintiff has never identified what these indicia might be or referred to them again in any subsequent submission.  For present purposes, therefore, this Court concludes that this Rejection Letter is not a forgery.  Where a plaintiff "put[s] forward no evidence that the documents submitted by the defendants were falsified or fraudulent," a district court is "entitled to rely on this evidence" at summary judgment.  *See Kiggundu v.*

evidence regarding the Rejection Letter's mailing or receipt, other than the Rejection Letter itself.  *Id.*  There is no certified-mail receipt associated with this Rejection Letter.  The affidavit submitted by Defendant Liberty Life's former representative, Judy Mann, explains that the copy of the Rejection Letter in the record is a "true and correct" copy of a document generated in "the regular course of business" by employees of Defendant Liberty Life.  Def. Liberty Life's Mot. Ex. 3 ("Mann Affidavit") 12, ECF No. 25-2.  Judy Mann's affidavit, however, indicates no first-hand knowledge that this particular Rejection Letter was actually sent.  *See id.*  Neither party has produced any affidavit testimony as to whether the Deceased actually received this Rejection Letter.

### 3.    The undated policy to insure Plaintiff's life

Finally, Defendants allege that, "[c]oncurrent with the Rejection Letter" that was sent to the Deceased, Defendant Liberty Life also sent a separate letter to Plaintiff to inform her that her portion of the joint application for insurance was approved.  Def. CitiMortgage's Mot. 25.  The record contains a copy of a purported insurance policy, according to which Defendant Liberty Life undertakes to insure the life of Plaintiff.  Def. CitiMortgage's Mot. Ex. F ("Defs.' Insurance Policy") 5, ECF No. 23-7.  This policy has an "effective date" of October 1, 2011, at which time the policy would apparently have come into force.  *Id.*  But there is no indication when this document might have been generated, mailed, or received.  The cover letter attached to this insurance policy is undated.  Defs.' Ins. Policy 3.  The cover letter also makes no reference to the Deceased.  *Id.*  Like the Rejection Letter, Plaintiff also disputes that this insurance policy was

---

*Mortgage Electronic Registration Systems Inc.*, 469 Fed. App'x 330, 330 (5th Cir. 2012) (citing *Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir. 1995)).  Whether the Rejection Letter is a forgery, however, is an issue entirely distinct from whether the Rejection Letter was actually mailed or received, and what it might demonstrate regarding the parties' meeting of the minds.

ever mailed by Defendant Liberty Life, or received and read by either the Deceased or Plaintiff. Pl.'s Resp. ("Pl.'s Proposed Undisputed Facts") 2, ECF No. 37-7.

There is no testimony in the record identifying the date when this particular insurance policy would have been mailed. Nor is there any testimony confirming that this insurance policy was, in fact, ever mailed. No certified-mail receipt has been produced in relation to this insurance policy. *See* Defs.' Ins. Policy. A "Notice of Issue" apparently sent from Defendant Liberty Life to Defendant CitiMortgage suggests that Defendant Liberty Life had at some point "issued and mailed a policy/certificate" to Plaintiff. *Id.* at 12. However, this Notice of Issue is neither dated nor signed, and there is no testimony to clarify or confirm the accuracy of this communication. *See id.* One of Defendant Liberty Life's internal records also lists August 8, 2005, as the "creation date" for this insurance policy, but says nothing about whether this policy was actually mailed to Plaintiff on or around this date. Def. Liberty Life's Mot. Ex. A ("Def. Liberty Life's Internal Record") 18, ECF No. 25-2. The affidavit submitted by Defendant Liberty Life's former representative, Judy Mann, explains only that the copy of Plaintiff's insurance policy in the record is a "true and correct" copy of the insurance policy that Defendant Liberty Life "kept and maintained in the regular course of business . . . ." Mann Aff. 13. Judy Mann's affidavit, however, indicates no first-hand knowledge that this particular insurance policy was actually sent to Plaintiff or the Deceased. *See id.*

Whether or not they were ever mailed, both the insurance policy and its cover letter were addressed to Plaintiff. Defs.' Ins. Policy 2. These documents, however, bore the address of the Deceased, which had also been pre-printed on both of the applications for insurance: 5853 Diamond Point. *Id.*; *see also* Single Appl. 2; Joint Appl. 2. It is unclear from the record, however, whether Plaintiff resided with the Deceased at 5853 Diamond Point during 2005.

Plaintiff indicated that 5853 Diamond Point was her address on December 4, 2008, when she submitted a claim for insurance to Defendant Liberty Life.  *See* Pl.'s Mot. Ex. J ("Pl.'s Claim Paperwork") 10-11, ECF No. 21-4.  Plaintiff's affidavit confirms that she was never "the owner or the mortgagor of the home located at 5853 Diamond Point," but is silent as to whether she resided there in 2005.  Hines Aff. 1.  Plaintiff has also testified in her affidavit that Defendants never "delivered to me any policy whatsoever.  I never received any policy for decreasing accidental death insurance insuring me or my life from Liberty Life Insurance Company or from CitiMortgage, Inc."  *Id.* at 2.  There is no testimony or documentary evidence indicating whether the Deceased herself ever received or read the insurance policy addressed to her daughter at 5853 Diamond Point.

### F.      Defendants' Collection of Insurance Premiums

There are no disputes among the parties regarding the events that occurred subsequent to August 2005, although the meaning of these events is disputed.  Until her death on November 22, 2007, the Deceased thereafter received and paid "a mortgage bill every month from Defendant CitiMortgage, which included a premium of $17.11 for Mortgage Decreasing Accidental Death Insurance underwritten by [Defendant] Liberty Life Insurance Company . . . ." *See* Pl.'s Mot. 1.  Defendants argue that these premiums were paid under a policy to insure Plaintiff's own life, while Plaintiff argues that these premiums were paid under a policy to insure the life of the Deceased.

The Deceased never paid $17.40, which was the SRATE associated with an individual policy identified in the first application.  *See* Single Appl. 2.  Nor did the Deceased ever pay $25.76, which was the JRATE associated with the joint policy identified in the second application.  *See* Joint Appl. 2.  Rather, the premiums paid by the Deceased along with her

mortgage payment were always $17.11, which matched the SRATE associated with a single applicant's premiums in the application submitted on July 20, 2005.  *See* Pl.'s Mot. 1; Joint Appl. 2.  On at least seven occasions after August 2005, Defendant CitiMortgage sent collection letters prompting the Deceased to pay her late premiums.  *See* Pl.'s Mot. Exs. C, D, E, F, G, H, I ("Collection Letters") 3-9, ECF No. 21-2.  In each of these letters, Defendant CitiMortgage wrote: "Thank you for safeguarding your family and home with Liberty Life.  We would like to continue providing you with the security of knowing your plan is helping to protect your family's future."  *Id.*   In each of these letters, Defendant CitiMortgage referred only to the Deceased and made no reference to Plaintiff.  *Id.*

### G.      Plaintiff's Claim for Insurance

The Deceased passed away as the result of an accident in November 2007.  *See* Pl.'s Claim Paperwork 10-11.  The following year, Plaintiff submitted a claim under what she apparently understood to be a policy underwritten by Defendant Liberty Life to insure the life of the Deceased.  *Id.*  After conducting a search for such a policy, however, Defendant Liberty Life replied that it had never issued a policy to insure the life of the Deceased.  *See* Pl.'s Mot. Ex. K ("Post-Claim Correspondence") 13, ECF No. 21-4.  Rather, Defendant Liberty Life's record search was only able to locate Plaintiff's own life insurance policy.  *Id.*  On November 10, 2008, November 13, 2008, and December 16, 2008, however, Defendant Liberty Life sent a series of letters to Plaintiff with a subject heading that named the Deceased as the "Insured."  *See* Post-Claim Correspondence 13, 15, 17.

Plaintiff commenced this lawsuit in District Court of El Paso County, Texas on October 27, 2011.  *See* Def.'s Notice of Removal, ECF No. 1.  Invoking this Court's diversity jurisdiction, Defendant removed this suit on December 19, 2011, under 28 U.S.C. §§ 1332 and

1441.  *Id.*  Plaintiff then filed a motion for partial summary judgment on September 18, 2012.

Pl.'s Mot., ECF No. 21.  Defendant CitiMortgage filed a cross-motion for summary judgment on

October 2, 2012.  Def. CitiMortgage's Mot., ECF No. 23.  Defendant Liberty Life filed a cross-

motion for summary judgment on October 4, 2012.  Defendant Liberty Life's Mot., ECF No. 26.

## II.    DISCUSSION

### A.    Standard

A court must enter summary judgment "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Weaver v. CCA

Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008).  "A fact is 'material' if its resolution in favor of

one party might affect the outcome of the lawsuit under governing law."  *Sossamon v. Lone Star

State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quoting *Hamilton v. Segue Software, Inc.*, 232

F.3d 473, 477 (5th Cir. 2000) (per curiam)).  A dispute about a material fact is genuine only "if

the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ellison v. Software Spectrum, Inc.*,

85 F.3d 187, 189 (5th Cir. 1996).

"[The] party seeking summary judgment always bears the initial responsibility of

informing the district court of the basis for its motion, and identifying those portions of [the

record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*,

477 U.S. at 323; *Wallace v. Tex. Tech. Univ.*, 80 F.3d 1042, 1046-47 (5th Cir. 1996).  To show

the existence of a genuine dispute, the nonmoving party must support its position with citations

to "particular parts of materials in the record, including depositions, documents, electronically

stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory

14

answers, or other materials[,]" or show "that the materials cited by the movant do not establish

the absence . . . of a genuine dispute, or that [the moving party] cannot produce admissible

evidence to support the fact." Fed. R. Civ. P. 56(c).

A court resolves factual controversies in favor of the nonmoving party; however, factual

controversies require more than "conclusory allegations," "unsubstantiated assertions," or "a

'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

Further, when reviewing the evidence, a court must draw all reasonable inferences in favor of the

nonmoving party, and may not make credibility determinations or weigh evidence. *Man Roland,*

*Inc. v. Kreitz Motor Express, Inc.*, 438 F.3d 476, 478-79 (5th Cir. 2006) (citing *Reeves v.*

*Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). Thus, the ultimate inquiry in a

summary judgment motion is "whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

*Anderson*, 477 U.S. at 251-52.

Finally, when evaluating cross-motions for summary judgment, the "[c]ross-motions

must be considered separately, as each movant bears the burden of establishing that no genuine

issue of material fact exists and that it is entitled to judgment as a matter of law." *Shaw*

*Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 538-39 (5th Cir. 2004) (citing 10A

Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* §

2720 (3d ed. 1998) ("Wright")). "But if there is no genuine issue and one or the other party is

entitled to prevail as a matter of law, the court will render judgment." Wright, § 2720.

**B.     Breach of Contract**

Plaintiff has characterized her claim to the benefit of the Deceased's alleged insurance

policy as an action for breach of contract. *See* Pl.'s Mot. 6. Indeed, in Texas, "insurance policies

15

are contracts" and "the rights and obligations arising from them and the rules used to construe them are those generally pertaining to contracts."  *See Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008) (citing *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994) and *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 665 (Tex. 1987)).

Defendants have moved for summary judgment on three grounds.  First, Defendant CitiMortgage argues that Plaintiff is not a proper party to sue for breach of contract.  Def. CitiMortgage's Mot. 19-20; Def. CitiMortgage's Reply 8-9.  Second, because Plaintiff argues in part that a contract arose between Defendant Liberty Life and the Deceased by way of Defendant CitiMortgage's communications with the Deceased, both Defendants argue that there is no evidence of an agency relationship between Defendant CitiMortgage and Defendant Liberty Life. Def. CitiMortgage's Reply 5-6, ECF No. 38; Def. Liberty Life's Reply 6-7, ECF No. 39.  Third, both Defendants argue that as a matter of law the evidence cannot support the existence of a contract for insurance.  Def. CitiMortgage's Mot. 13; Def. Liberty Life's Mot. 12.  Plaintiff, for her part, opposes each of these arguments, and moves for summary judgment on the grounds that the evidence unequivocally demonstrates the existence and breach of a contract.  Pl.'s Mot. 6. The Court addresses each of these arguments in turn.

### 1.      Whether Plaintiff is a proper party

Defendant Liberty Life has not contested that Plaintiff is a proper party to sue for breach of contract in this case.  Defendant CitiMortgage has argued briefly, however, that Plaintiff is not a proper party to this case because she is not named as the beneficiary of any policy for Mortgage Decreasing Accidental Death Insurance.  Def. CitiMortgage's Mot. 19-20; Def. CitiMortgage's Reply 8-9.  Indeed, both applications for insurance in this case designated only Defendant CitiMortgage as the beneficiary.  *See* Single Appl. 2; Joint Appl. 2.  Plaintiff has

16

countered, *inter alia*, that she is nonetheless a third-party beneficiary of this insurance policy. Pl.'s Resp. 13, ECF No. 37.

The Court need not evaluate either argument, however.  Neither of Defendant CitiMortgage's assertions that Plaintiff is not "the proper party to sue" is supported by even a single citation to legal authority.  *See* Def. CitiMortgage's Mot. 19-20; Def. CitiMortgage's Reply 8-9.  Any dispositive motion, including a motion for summary judgment, must state the "grounds therefor and cite any applicable rule, statute, or other authority, if any, justifying the relief sought."  W.D. Tex. Local Rule CV-7.  Accordingly, Defendant CitiMortgage's motion cannot succeed on this basis.  *See Lilani v. Noorali*, No. H-09-2617, 2011 WL 13667, at *15 (S.D. Tex. Jan. 3, 2011) ("Because the Defendants do not cite to any legal authority in support of their summary-judgment arguments, the court concludes they have not met their summary-judgment burden and will deny the Defendants' Summary-Judgment Motion . . . .").

Moreover, neither Defendant has contested Plaintiff's status as the personal representative of the Deceased's estate.  Under Texas law, because the estate "stands in the shoes" of a decedent, the estate therefore may be "in privity" with parties that entered into legal relationships with the decedent prior to his or her death.  *See, e.g.*, *Belt v. Oppenheimer Blend Harrison & Tate*, 192 S.W.3d 780, 786-87 (Tex. 2006) (discussing a claim for legal malpractice brought by the decedent's estate).  A decedent's estate, however, "is not a legal entity and may not properly sue or be sued as such."  *Id.* (citing *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 850 (Tex. 2005)).  Rather, certain individuals possess capacity to bring a claim on the estate's behalf.  *Id.*  Generally speaking, "the estate's personal representative has the capacity to bring a survival claim."  *Id.*

Here, Defendants have made no attempt to show that Plaintiff is not the personal representative of the Deceased's estate. Plaintiff is apparently named as the "Independent Executrix" in the Deceased's last will and testament. Pl.'s Resp., ("Pl.'s Will & Trust Documents") 1, ECF No. 28-3. She is also apparently named the "Successor Trustee" in a trust established to contain all of the Deceased's real property, including "Parcel #1," which is the home at 5853 Diamond Point. *See id.* at 8, 19. Defendants have never contested or addressed the importance of these facts, cited any law, or made any arguments regarding the legal validity of these estate-planning documents.[3]

Nor have Defendants argued that the personal representative of an estate cannot bring an action for breach of contract. There are undoubtedly circumstances where two distinct grounds for standing may give rise to two different remedies, as with the distinct remedial systems created by the Texas Wrongful Death Statute ("TWDS") and Texas Survival Statute ("TSS"). *See Pluet v. Frasier*, 355 F.3d 381, 384 (5th Cir. 2004) ("The TSS differs from the TWDS in that the TSS preserves a claim for the estate rather than creating a new cause of action for those surviving the decedent."). If there is such a distinction between any remedies sought in this case, Defendant CitiMortgage has not explained what this distinction might be. In her prayer for relief, the Plaintiff has requested various types of "actual damages." Pl.'s Original Compl. 11. Defendant CitiMortgage has never suggested that "actual damages" are unavailable to Plaintiff in her capacity as the personal representative of the Deceased's estate or as successor trustee.

Accordingly, the Court will not grant Defendant CitiMortgage's motion for summary judgment on the basis that Plaintiff is an improper party to this case.

---

[3] While "admit[ting] that Plaintiff is named as the successor trustee," Defendant CitiMortgage has argued briefly that the trust documentation has "not been authenticated . . . ." Def. CitiMortgage's Reply 12. The Court observes, however, that both the trust documentation and the last will and testament were apparently notarized on January 9, 2004, by a Notary Public in and for the State of Texas. Pl.'s Will & Trust Docs. 1, 18.

### 2.  Agency

Defendants have argued that there is no evidence of an agency relationship between Defendant CitiMortgage and Defendant Liberty Life.  Def. CitiMortgage's Reply 5-6, ECF No. 38; Def. Liberty Life's Reply 6-7.  Plaintiff argues that the First Collection Letter, sent from Defendant CitiMortgage to the Deceased on August 26, 2006, provides the objective basis for the Court to conclude that the Deceased entered into a contract for insurance with Defendant Liberty Life.  For the actions of Defendant CitiMortgage to bind Defendant Liberty Life, Defendant CitiMortgage must have acted as the agent for Defendant Liberty Life.

In the insurance context, as under the principles of agency law generally, an agent may be endowed by a principal with actual or apparent authority.  *TIG Ins. Co. v. Sedgwick James*, 276 F.3d 754, 760-61 (5th Cir. 2002).  The issue of whether a party is "an agent of the insurer is a question of fact . . . ."  *Mia Reed and Co., Ltd. v. United Fire & Cas. Co.*, No. H-10-4440, 2012 WL 2499932, at *8 (S.D. Tex. June 27, 2012) (citing *Glenbrook Patiohome Owners Ass'n v. Lexington Ins. Co.*, No. H-10-2929, 2011 WL 666517, at *9 (S.D. Tex. February 14, 2011)).  Texas law does not presume agency.  *See IRA Res., Inc. v. Griego*, 221 S.W.3d 592, 597 (Tex. 2007).  The party alleging agency has the burden to prove its existence.  *Id.*  At the summary judgment stage, however, all reasonable inferences as to questions of fact must nonetheless be drawn in favor of the non-moving party.  *See Man Roland, Inc.*, 438 F.3d at 478-79 (citing *Reeves*, 530 U.S. at 150).

To confer actual authority, the principal must intentionally confer the authority, explicitly allow the agent to believe that it has the authority, or carelessly permit the agent to believe it has the authority.  *Spring Garden 79U, Inc. v. Stewart Title Co.*, 874 S.W.2d 945, 948 (Tex. App. 1994).  Apparent authority, by comparison, arises through acts of participation, knowledge, or

19

acquiescence by the principal that clothe the agent with the indicia of apparent authority. *See Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex. 2007). A person who seeks to bind a principal based on the agent's apparent authority must show that the principal acted in such a way that a reasonably prudent person would believe the agent could bind the principal. *See id.*; *Biggs v. United States Fire Ins. Co.*, 611 S.W.2d 624, 629 (Tex. 1981). The principal must visibly confer authority for the agent to perform a range of tasks that include the disputed action. *Ames v. Great S. Bank*, 672 S.W.2d 447, 450 (Tex. 1984). If the agent acts with apparent authority, it will bind the principal, regardless of the agent's actual authority. *Biggs*, 611 S.W.2d at 629.

Defendant CitiMortgage characterizes the existence of an agency relationship between Defendant CitiMortgage and Defendant Liberty Life as merely "an unsubstantiated allegation." Def. CitiMortgage's Reply 6, ECF No. 38. The Court observes, however, that the collaboration between Defendants in the marketing of Mortgage Decreasing Accidental Death Insurance has provided a context in which an agency relationship is likely to arise. By authorizing Defendant CitiMortgage to collect the premiums for insurance policies associated with this product, Defendant Liberty Life may have conferred actual authority on Defendant CitiMortgage. *See Spring Garden 79U, Inc.*, 874 S.W.2d at 948. Defendant Liberty Life may also have clothed Defendant CitiMortgage with apparent authority. *See Gaines*, 235 S.W.3d at 182. Certain activities, such as concluding contracts for insurance, might well have fallen outside the scope of Defendant CitiMortgage's actual or apparent authority. *See Celtic Life Ins. Co. v. Coats*, 885 S.W.2d 96, 98-99 (Tex. 1994). But Defendants have not precisely argued what the scope of this authority might have been or why Defendant CitiMortgage's First Collection Letter, sent to the Deceased on August 26, 2006, might have fallen outside the scope of that authority.

20

Essentially, the issue of whether a party is "an agent of the insurer is a question of fact . . . ." *Mia Reed and Co.*, 2012 WL 2499932, at *8 (citing *Glenbrook Patiohome Owners Ass'n*, 2011 WL 666517, at *9).  But Defendants have failed to demonstrate the absence of a genuine issue of material fact with respect to an agency relationship between Defendant CitiMortgage and Defendant Liberty Life.  Accordingly, Defendants are not entitled to judgment as a matter of law on this basis.  *See Celotex*, 477 U.S. at 323; *Wallace*, 80 F.3d at 1046-47.

### 3. The existence of a contract

The majority of the parties' arguments have focused on a third issue: whether the evidence of a valid contract in this case is so one-sided that the Court may decide Plaintiff's action for breach of contract as a matter of law.  Under Texas law, "[t]he essential elements of a breach of contract claim are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach."  *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 418 (5th Cir. 2009) (quoting *Aguiar v. Segal*, 167 S.W.3d 443, 450 (Tex. App. 2005)).  Here, there is no genuine dispute regarding the elements of performance, breach, or damages.[4]  Rather, each of the parties' motions for summary judgment must succeed or fail based on the first element: whether or not Defendants' actions ever created a valid contract to insure the life of the Deceased.  If such a contract existed, then Defendant Liberty Life has breached the contract by failing to pay Defendant CitiMortgage the outstanding balance of the Deceased's mortgage,

---

[4] Defendant Liberty Life argues briefly that there is no "proof of performance" in compliance with the terms of the first application, even if this document constituted a contract, because the Deceased paid monthly premiums of $17.11 rather than $17.40.  *See* Def. Liberty Life's Mot. 21.  The Court need not reach this argument.  As explained below, neither application for insurance constituted a contract as a matter of law.  If any contract has actually been formed in this case, it was created in response to Defendant CitiMortgage's First Collection Letter of August 26, 2005, which requested that the Deceased pay monthly premiums of exactly $17.11.  *See* First Collection Letter.  If this contract was valid, therefore, there was indeed performance in compliance with this contract.

thereby injuring the estate of the Deceased.  If no such contract existed, then no breach or injury has occurred.

The following elements are required for the formation of a contract: (1) an offer; (2) acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with the intent that it be mutual and binding.  *Critchfield v. Smith*, 151 S.W.3d 225, 233 (Tex. App. 2004); *Hubbard v. Shankle*, 138 S.W.3d 474, 481 (Tex. App. 2004).  In her motion for summary judgment, Plaintiff has essentially advanced two different theories as to how the evidence in the record demonstrates the elements of a valid contract.  Under the first theory, Defendants' solicitation letters constituted offers to contract for the insurance of the life of the Deceased, which the Deceased accepted by submitting her applications.  Under the second theory, the applications for insurance constituted offers to contract, acceptance of which was then communicated by Defendant CitiMortgage's correspondence on August 26, 2005.

"Whether a contract exists involves both questions of fact—such as the intent of the parties—and questions of law—such as whether the facts as found constitute a contract." *Merritt-Campbell, Inc. v. RxP Products, Inc.*, 164 F.3d 957, 961 (5th Cir. 1999) (citing *Zimmerman v. H.E. Butt Grocery Co.*, 932 F.2d 469, 471 (5th Cir. 1991)).  The Court now evaluates Plaintiff's two theories.  As set forth below, the Court concludes that Plaintiff's first theory fails as a matter of law.  Plaintiff's second theory, however, can neither be rejected nor upheld without submission to a finder of fact.  This case therefore is not ripe for summary judgment.

a.      **Plaintiff's first theory fails as a matter of law, because both applications constituted offers rather than acceptances.**

According to Plaintiff's first theory, Defendants' solicitation letters constituted offers that the Deceased accepted by applying for insurance on either April 23, 2005, or July 20, 2005.  In Plaintiff's view, these solicitation letters constituted offers rather than brochures or advertisements because they contained price quotes that were specifically tailored to the Deceased and to no other person.  That is, the solicitation letters quoted the SRATE and JRATE premiums that were determined based on the outstanding balance of the Deceased's particular mortgage.  Pl.'s Resp. 15, ECF No. 37.

Plaintiff's argument fails, however, because the applications for insurance did not constitute acceptances.  Rather, both applications for insurance constituted offers to contract.  The general rule in Texas is that "[t]here is no contract unless and until the application for insurance is accepted by the insurance company."  *Inglish v. Prudential Ins. Co. of Am.*, 928 S.W.2d 702, 706 (Tex. App. 1996); *First Nat. Bank of Jefferson v. Tri-State Gen. Agency, Inc.* 578 S.W.2d 456, 459 (Tex. App. 1979) ("As a general rule, an insurance company is not bound to accept an application or proposal for insurance, but may reject it for any reason or arbitrarily."); *Roberts v. California-Western States Life Ins. Co.*, 470 S.W.2d 719, 726 (Tex. App. 1971); *Am. Life Ins. Co. v. Nabors*, 76 S.W.2d 497, 500 (Tex. Com. App. 1934, opinion adopted).  In Texas, therefore, the "application becomes binding only when the insurer accepts the risk of the insurance applied for, and the acceptance must be actual, evidenced by some act of the insurer . . . ."  *Roberts*, 470 S.W.2d at 726 (quoting *Victory Life Ins. Company v. Ferrell*, 24 S.W.2d 774, 774 (Tex. Civ. App. 1930)).

This is similar to the rule in other jurisdictions that an application for insurance operates as an offer by the applicant to the insurer to purchase a policy.  *See, e.g.*, *Griffin v. State Farm*

23

*Fire & Cas. Co.*, 104 P.3d 283 (Colo. 2004); *Inola Mach. & Fabricating Co. v. Farmers New World Life Ins. Co.*, 631 F.2d 712, 714 (10th Cir. 1980); *Recupito v. Inter-Ocean Ins. Co.*, 362 F. Supp. 577, 580 (E.D. Pa. 1973).

Similarly, Defendants' solicitation letters were not offers.  Even though they contained price quotes that were tailored specifically to the Deceased, these letters contained conditional language that rendered them mere invitations for the Deceased to make an offer.  "Generally, a price quotation, such as one appearing in a brochure or on a flyer, is not considered an offer; rather, it is typically viewed as an invitation to offer."  *J.D. Fields & Co., Inc. v. U.S. Steel Int'l, Inc.*, 426 Fed. App'x 271, 276-77 (5th Cir. 2011) (applying Texas law to a series of purchase orders).  For a price quotation to create a binding offer, it must reasonably appear that a buyer's assent to the quote is all that is needed to ripen the offer into a contract.  *Crest Ridge Const. Group, Inc. v. Newcourt Inc.*, 78 F.3d 146, 152 (5th Cir. 1996).  A price quote that is subject to the seller's subsequent confirmation is not an offer because the buyer's assent will not consummate the contract.  *See Axelson, Inc. v. McEvoy-Willis*, 7 F.3d 1230, 1233 (5th Cir. 1993) (observing that, under Texas law, a price quotation requiring a seller to accept an order could not be an offer, but only an invitation for an offer).  Such qualifying language converts what could otherwise have been an offer into a proposal or preliminary negotiation.  *Crest Ridge*, 78 F.3d at 152.  Correspondence containing a price quote cannot constitute an offer if the correspondence contains sufficient "indicia suggesting that an order would be subject to approval before it was accepted."  *See J.D. Fields & Co., Inc.*, 426 Fed. App'x at 278.

Because Defendants' solicitation letters contained precisely this sort of qualifying language, the solicitation letters reasonably communicated that the Deceased's application would subsequently be subject to the insurer's approval process.  The front of the solicitation letters

24

explained in bold print that "your acceptance is guaranteed (if from the age of 18 through 69)."

Defs.' Template Appl. 25.  The back of the solicitation letters repeated that, "[i]f you're from the

age of 18 through 69, you can't be turned down for this valuable insurance . . . ."  Defs.'

Template Appl. 26.  This language might conceivably have communicated an offer to an

individual between the ages of eighteen and sixty-nine.  It might also have left open the

possibility that the Deceased's application still could be approved, even though the Deceased's

age prevented the "guaranteed" acceptance of her application.  But this language also reasonably

communicated that some further approval from Defendant Liberty Life was necessary before the

creation of an insurance policy, at least in the case of an eighty-seven-year-old applicant.

Because the solicitation letters twice emphasized the issue of age in the context of an

application's being "turned down," and required the Deceased to provide her date of birth, the

solicitation letters left no doubt as to the insurer's right to reject Deceased's application on the

basis of age.  *See Axelson*, 7 F.3d at 1232-33.

The Court finds, therefore, that these solicitation letters could not have caused the

Deceased "reasonably to believe that assent (i.e., acceptance) will conclude the deal."  *Id.* (citing

*Mid-south Packers, Inc. v. Shoney's, Inc.*, 761 F.2d 1117, 1121 (5th Cir.1985)).  This solicitation

letter therefore constituted merely an invitation for the Deceased to make an offer, rather than an

offer.  Accordingly, neither of the insurance applications submitted on April 23, 2005, or July 20,

2005, themselves constituted contracts, which is indeed the ordinary rule for insurance

applications in Texas.  *See Inglish*, 928 S.W.2d at 706; *First Nat'l Bank of Jefferson*, 578 S.W.2d

at 459.

The Court also observes that this conclusion is fully supported by the actual conduct of

the Deceased subsequent to the submission of the first application.  That is, on July 20, 2005,

Plaintiff and the Deceased submitted a second application for the insurance of the life of the

Deceased.  Joint Appl. 2.  Had the Deceased actually believed that a contract for insurance had

already arisen from her first application submitted by the Deceased on April 23, 2005, this action

would have lacked any purpose.  The most reasonable explanation for the second application, of

course, is that Deceased actually understood that her applications for insurance could not bind

the Defendants until they were approved.  Indeed, there is no other reasonable reading of the

conditional language contained within the solicitation letter.  *See Axelson*, 7 F.3d at 1232-33.

> **b.      Plaintiff's second theory cannot be evaluated as a matter of law.**

Plaintiff's second theory is that Defendant CitiMortgage's correspondence evidenced

Defendants' intent to contract for the insurance of the life of the Deceased.  Pl.'s Mot. 7.

Plaintiff rightly recognizes that, as a matter of law, this correspondence could not have

constituted an acceptance of any offer to contract submitted by the Deceased or Plaintiff during

2005.  "An acceptance must be identical with the offer in order to make a binding common-law

contract." *Kingwood Home Health Care, L.L.C. v. Amedisys Inc.*, 375 S.W.3d 397, 400 (Tex.

App. 2012) (citing *Antonini v. Harris Cnty. Appraisal Dist.*, 999 S.W.2d 608, 611 (Tex. App.

1999).  "[T]he question of whether an offer was unconditionally accepted is primarily a matter of

law for the court." *Id.*  Here, the First Collection Letter does not describe terms that are identical

to either the single application submitted by the Deceased on April 23, 2005, or the joint

application submitted by Plaintiff and the Deceased on July 20, 2005.  In particular, the First

Collection Letter specifies that Defendants will begin to collect a "monthly premium of $17.11."

First Collection Letter.  This price term, therefore, did not match the SRATE premium of $17.40

selected in the single application submitted on April 23, 2005, or the JRATE premium of $25.67

selected in the joint application submitted on July 20, 2005.  *See* Single Appl. 2; Joint Appl. 2.

As a matter of law, therefore, the First Collection Letter could not constitute an acceptance of either offer.

The First Collection Letter may, however, have constituted a counteroffer.[5]  A communication "that changes or qualifies an offer's material terms constitutes a rejection and counteroffer rather than an acceptance." *Kingwood Home Health Care*, 375 S.W.3d at 400 (citing *Parker Drilling Co. v. Romfor Supply Co.*, 316 S.W.3d 68, 73-74 (Tex. App. 2010)).  A reasonable finder of fact might understand this correspondence as a counteroffer to insure the life of the Deceased, who was the only applicant mentioned in the Collection Letter, in exchange for the SRATE premiums described in the joint application submitted on July 20, 2005.  *See* Single Appl. 2; Joint Appl. 2.  If understood in this way, it is also possible for a reasonable finder of fact to conclude that Defendant accepted this counteroffer by tendering her first payment of $17.11. *See, e.g.*, *Horton v. DaimlerChrysler Fin. Servs. Ams., L.L.C.*, 262 S.W.3d 1, 6 (Tex. App. 2008) (finding that "acceptance may be shown by conduct" and that an offeree's "act in tendering the first installment of $500.00 was a clear, unequivocal act indicating acceptance").

If understood in this way, a reasonable finder of fact could conclude that the parties thus had contracted for Mortgage Decreasing Accidental Death Insurance according to the other material terms set forth in the solicitation letter.  That is, Defendant CitiMortgage, as the agent of Defendant Liberty Life, may have invoked the terms of the solicitation letter by referring to the

---

[5] Plaintiff has alternatively described Defendant CitiMortgage's correspondence as an act of "ratification" and "a counteroffer."  *See, e.g.*, Pl.'s Reply 16, ECF No. 28-2.  In this context, however, the concept of "ratification" is entirely inapplicable, because there is no allegation that Defendants had ever entered into any "voidable" obligation. "The threshold question presented is whether the action taken . . . is 'void' or merely 'voidable.' If 'void,' then the [action] . . . is a nullity, of no effect, and not susceptible of ratification.  A 'voidable' act operates to accomplish the thing sought to be accomplished until the fatal vice in the transaction has been judicially ascertained and declared. A voidable act may be subsequently ratified or confirmed."  *Swain v. Wiley College*, 74 S.W.3d 143, 146-47 (Tex. App. 2002) (citing *Slaughter v. Qualls*, 162 S.W.2d 671, 674 (1942); *Cummings v. Powell*, 8 Tex. 80, 85 (1852)). The Court has already found as a matter of law that neither application for insurance constituted a contract, whether voidable or otherwise.  Therefore, if any intention to form a contract was subsequently expressed in the First Collection Letter, then this communication constituted a counteroffer rather than an act of ratification.

Deceased's "Accidental Death plan" and the "monthly premium of $17.11," which may have been recognizable as the SRATE specified in the joint application submitted on July 20, 2005. *See* First Collection Letter.  The lack of a formalized policy contained within any single document would not have prevented the formation of a contract as a matter of law: "Save for regulatory purposes, not in any way here involved, Texas law does not require any particular form, and it recognizes the validity of . . . a contract of insurance regardless of its informality." *Travelers Indem. Co. v. Holman*, 330 F.2d 142, 151 (5th Cir. 1964).

The Court observes that this alleged contract for insurance would include all of the "essential terms and elements of a contract of insurance on which the parties minds must meet," including: "the rate of the premium; the duration of the policy; the nature of the risk; the description of the property or person . . . to be insured . . .; [and] the amount of insurance." *See* 45 Tex. Jur. 3d Insurance Contracts and Coverage § 19.  That is, the First Collection Letter plainly identified the rate of the premium as $17.11 and the nature of the risk as "Accidental Death." *See* First Collection Letter.  The amount of the insurance would already have been specified in the solicitation letter and the application for insurance as the outstanding balance of the Deceased's mortgage. *See* Joint Appl. 2.  The duration of the policy might have been understood as the remainder of the Deceased's life or the period until the outstanding balance of the mortgage was paid off through regular mortgage payments. *See id.*  Finally, a reasonable finder of fact might conclude, based on the reference to "your Accidental Death plan" and the absence of any mention of Plaintiff, that the First Collection Letter was identifying the Deceased herself as the insured person.

This interpretation of the events finds some support in Defendant Liberty Life's series of letters to Plaintiff on November 10, 2008, November 13, 2008, and December 16, 2008, in which

Defendant Liberty Life referred to the Deceased as the "Insured."  *See* Post-Claim Correspondence 13, 15, 17.  Drawing all inferences in favor of the non-moving party, this interpretation of events also demonstrates that neither of Defendants' motions for summary judgment can be granted on the grounds that no contract exists in this case as a matter of law.

      The Court must also, however, deny Plaintiff's motion for summary judgment.  Though Defendant CitiMortgage's correspondence could reasonably have been understood as a counteroffer, it remains to be determined whether there was actually a meeting of the minds.  "When only the meeting of the minds is disputed, the existence of a contract is a question of fact."  *Buxani v. Nussbaum*, 940 S.W.2d 350, 352 (Tex. App. 1997) (citing *Hallmark v. Hand*, 885 S.W.2d 471, 476 (Tex. App. 1994).  Before any conclusions may be drawn as to whether a meeting of the minds occurred in this case, the evidence must be weighed at trial.

      Moreover, it remains to be determined which correspondence actually was mailed and received in this case, and in what order.  Plaintiff alleges that the first communication received in August 2005 by the Deceased from either Defendant was the First Collection Letter dated August 26, 2005, in which Defendant CitiMortgage announced that it had "been informed by [Defendant] Liberty Life to begin collecting the premium for your Accidental Death plan."  First Collection Letter 2.  Defendants allege, by contrast, that the First Collection Letter was preceded by the Rejection Letter dated August 8, 2005, in which Defendant Liberty Life explained that it was "unable to consider [the Deceased's] application."  Rejection Letter 2.  Defendants also allege that "[c]oncurrent with the Rejection Letter," Defendant Liberty Life also sent a letter to Plaintiff to inform her that her application for accidental death insurance was approved. Def. CitiMortgage's Mot. 25.  Plaintiff disputes that either of these documents was ever sent by

Defendant Liberty Life or received by the Deceased or Plaintiff herself.  Pl.'s Proposed

Undisputed Facts 2, ECF No. 37-7.

"The determination of a meeting of the minds, and thus offer and acceptance, is based on

the objective standard of what the parties said and did and not on their subjective state of mind."

*Copeland v. Alsobrook*, 3 S.W.3d 598, 604 (Tex. App. 1999) (citing *Ishin Speed Sport, Inc. v.*

*Rutherford*, 933 S.W.2d 343, 348 (Tex. App. 1996)).  Without submission of this case to a jury,

however, it cannot be determined what Defendants objectively "said and did," or which

correspondence was actually mailed and received in August 2005.  Plaintiff testifies that she

never received "any policy for decreasing accidental death insurance insuring me or my life from

Liberty Life Insurance Company or from CitiMortgage, Inc."  Hines Aff. 2.  The Court cannot

say what the implications of this testimony might be, however, since Plaintiff has never

established whether she lived at 5853 Diamond Point Circle, where the insurance policy was

allegedly mailed in 2005.  In any case, testimony regarding the "non-arrival of such [a

document] is some evidence that no such [document] was mailed; in short, it becomes essentially

a question which testimony the jury will believe . . . ."  *See Sudduth v. Commonwealth Cnty Mut.*

*Ins. Co.*, 454 S.W.2d 196, 197-98 (Tex. 1970).

The Court also recalls that both Plaintiff and Defendants have made extensive arguments

regarding the terms of the solicitation letters.  Defendants urge this Court to draw an inference

that they would have been unlikely to insure the life of an eighty-seven-year-old applicant,

because their program for Mortgage Decreasing Accidental Death Insurance was marketed only

to individuals between the ages of eighteen and sixty-nine.  *See* Def. CitiMortgage's Mot. 15;

Def. Liberty Life's Mot. 9.  Plaintiff urges this Court to draw an inference that Defendants would

have been unlikely to insure the life of Plaintiff, because she had never been a customer of

Defendant CitiMortgage.  *See* Pl.'s Reply 15.  The Court emphasizes, however, that it cannot

choose from among reasonable inferences at the summary judgment stage.  On the contrary, all

reasonable inferences must be drawn in favor of the non-moving party.  *See Man Roland, Inc.*,

438 F.3d at 478-79 (citing *Reeves*, 530 U.S. at 150).

In general, "[c]ross-motions must be considered separately, as each movant bears the

burden of establishing that no genuine issue of material fact exists . . . ."  *Shaw Constructors*,

395 F.3d at 538-39.  In this case, important factual controversies remain as to exactly one

element of Plaintiff's case, and each of the parties' motions for summary judgment consequently

must fail.  *See Anderson*, 477 U.S. at 251-52.  To settle all of the remaining factual controversies,

including which items of correspondence were sent, whether they demonstrated a meeting of the

minds, and ultimately whether Defendants would have sought to contract with the Deceased, this

case must be submitted to a jury.  Neither Plaintiff nor Defendants, therefore, have demonstrated

their entitlement to summary judgment based on the existence or nonexistence of a contract.

*Celotex*, 477 U.S. at 323; *Wallace*, 80 F.3d at 1046-47.

### 4.     Estoppel

As a final observation and for the sake of completeness, the Court observes that the

parties have occasionally discussed Plaintiff's claim to the benefit of an insurance policy in terms

of estoppel.  *See, e.g.*, Def. Liberty Life's Resp. 23-24, ECF No. 25.  Plaintiff's motion for

summary judgment cannot succeed on a theory of estoppel.  Under Texas law, this cause of

action requires a showing of "(1) a false representation or concealment of material facts; (2)

made with knowledge, actual or constructive, of those facts; (3) with the intention that it should

be acted on; (4) to a party without knowledge or means of obtaining knowledge of the facts; (5)

who detrimentally relies on the representations."  *Ulico Cas. Co.*, 262 S.W.3d at 778 (citing

*Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 515-16 (Tex.1998)).

Plaintiff has failed to demonstrate as a matter of law that Defendants made any false

representations or concealed any material facts from the Deceased.  Accordingly, Plaintiff is not

entitled to summary judgment on this basis.  *Celotex*, 477 U.S. at 323; *Wallace*, 80 F.3d at 1046-

47.

## III.   CONCLUSION

For the reasons stated herein, Plaintiff's Motion for Partial Summary Judgment, ECF No.

21, Defendant CitiMortgage's Cross-Motion for Summary Judgment, ECF No. 23, and

Defendant Liberty Life's Cross-Motion for Summary Judgment, ECF No. 26, are each hereby

**DENIED**.

Because the motion at which Defendant CitiMortgage's Motion to Strike was directed

has itself been denied, Defendant CitiMortgage's Motion to Strike, ECF No. 24, is hereby

**DENIED** as moot.

**SO ORDERED.**

SIGNED this 25th day of January, 2013.

_____
KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE